**GOOD GUSTAFSON AUMAIS LLP**
J. Ryan Gustafson (Cal. Bar No. 220802)
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
jrg@ggallp.com

**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.*
100 S Commons, Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com
*Pro hac vice*

**SHENAQ PC**
Amir Shenaq, Esq.**
3500 Lenox Road, Ste. 1500
Atlanta GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com
***Pro hac vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Sarah Blansette, individually, and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RAEL, INC.,<br>,<br><br>Defendant. | CASE NO.  4:23-cv-00006-HSG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

Plaintiff Sarah Blansette brings this action on behalf of herself and all others similarly situated against RAEL, INC. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This case arises from Defendant's deceptive and misleading practices with respect to its marketing and sale of its cosmetic, hygiene, and beauty products (collectively, the "Product" or "Products").[1]

2.     Defendant manufactures, markets, and sells its Products throughout the United States including the State of California.

3.     Rael was launched in 2017 with the goal of providing "natural and organic feminine care products."[2]

4.     Despite the representations made on the Products' labels, marketing, and advertising which lead reasonable consumers to believe that the Products are "natural," they are not.

5.     The brand has grown significantly, and this growth was not by accident. Rather, it developed from specifically targeting the "natural" market with intense focus.

---

[1] At the time of this filing, the following Rael products are included in this definition: Natural Feminine Wipes.

[2] *Natural Feminine Care Brand Rael Hits Shelves at Target*, MARKETS INSIDER (April 9, 2019), https://markets.businessinsider.com/news/stocks/natural-feminine-care-brand-rael-hits-shelves-at-target-1028097653.

– 1 –

GOOD GUSTAFSON AUMAIS LLP

6.      As Co-Founder and CEO Yanghee Paik describes, "[T]he organic and natural feminine care market was very nascent, so we were looking for a partner who could help us amplify our consumer education about 'better for you, better for the environment' product options and eventually provide a platform for us to execute our holistic cycle care approach by launching us in multiple sections of the store. It is difficult to fully control how your brand is presented while working with multiple third-party retailers to scale. We strive to keep our story coherent and consistent through our digital marketing efforts as well as product packaging and retail displays."[3]

7.      Defendant's marketing efforts stress the purported "natural" composition of their Products.

8.      Notably, the principal display panel of all of the Products states "Natural."



---

[3] Jackie Chiquoine, *How 3 Startups Stay True to Their Roots While Expanding Into Mass Market Retailers*, GOOD COMPANY, https://www.uschamber.com/co/good-company/launch-pad/startups-expanding-into-mass-market-retailers.

9.     The word "Natural" is a representation to a reasonable consumer that the Product contains only natural ingredients.

10.    This represents that the Product is "natural" to consumers.

11.    Reasonable consumers, including Plaintiff, interpret "natural" to mean that the product does not include synthetic ingredients.

12.    Despite this representation, the Products are not natural because they include multiple synthetic ingredients.

13.    Specifically, the Products contain the following synthetic ingredients: Phenoxyethanol, Polysorbate 20, Sodium Benzoate, Citric Acid, Caprylyl Glycol, Ethylhexylglycerin, 1,2-Hexanediol, and Butylene Glycol.

14.    Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products are "natural" when purchasing the Products.

15.    This deception is not limited to the Products' labels, and rather, it is omnipresent throughout Defendant's marketing efforts.

16.    Reasonable consumers purchased the Products believing, among other things, that they were accurately represented. Specifically, reasonable consumers believed that the Products contained accurate label information and representations. Reasonable consumers would not have purchased the Products if they had known about the misrepresentations or would have purchased them on different terms.

17.    Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a Nationwide Class and a California Class. Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendant has enjoyed from

GOOD GUSTAFSON AUMAIS LLP

its unlawful and/or deceptive business practices, as detailed herein. In addition, Plaintiff seeks injunctive relief to stop Defendant's unlawful conduct in the labeling and marketing of the Products.

18.     Defendant's conduct violated and continues to violate, *inter alia*, the consumer protection statutes of California. Defendant has been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the Products to many locations within the state, where the Products are purchased by hundreds of consumers every day. Defendant also maintains its principal place of business in California.

20.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed Plaintiff's class and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Classes (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

21.     Venue is proper in this District under 28 U.S.C. § 1391. Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged

improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## DIVISIONAL ASSIGNMENT

22.     Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims arose in Napa and Lake Counties, and this action should be assigned to the San Francisco Division.

## PARTIES

23.     Plaintiff Sarah Blansette is a citizen of California who purchased the Products during the class period, as described herein. Plaintiff's purchases took place in California. In addition, the advertising and labeling on the package of the Products purchased by Plaintiff, including the "natural" representations, is typical of the advertising and labeling of the Products purchased by members of the Class. Plaintiff relied on the representation on the packaging that the Products were "natural." Specifically, she was exposed to, read, and relied upon "natural" written on the front of the Product, the plant images in the shape of an "R" on the front of the Product, and "nature meets nurture" on the side of the Product.

a. Within the past three years, Plaintiff purchased the Rael Natural Feminine Wipes on multiple occasions. These purchases were made at retailers throughout California. Most recently in April 2021, Plaintiff purchased Defendant's Product from a Target store in Napa, CA at a price of approximately $6.00.

b. Plaintiff continues to desire to purchase natural beauty products, and continues to see Defendant's Products at stores when she shops. She

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

would purchase the Products in the future if they were not deceptively labeled, but unless Defendant is enjoined in the manner Plaintiff requests, she may not be able to reasonably determine whether the Products have been changed or reformulated to conform with the representations made on the packaging.

    c.   Plaintiff's legal remedies are inadequate to prevent these future injuries.

24.    Defendant RAEL, INC. is a Delaware corporation with its principal place of business in Buena Park, California.

    a.   From its headquarters in California, Defendant produces, markets and distributes the Products in retail stores across the United States including stores physically located in the State of California and this District.

25.    Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

26.    Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

## FACTS

### A. Consumers Value Representations that a Product is Natural

27.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products, and everyday household products.[4]

28.     Companies such as the Defendant have capitalized on consumers' desires for purportedly "natural products."

29.     Indeed, consumers are willing to pay, and have paid, a premium for products branded "natural" over products that contain synthetic ingredients.

30.     In 2015, sales of natural products grew 9.5% to $180 billion.[5] Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

31.     Further, consumers have become increasingly concerned about the effects of synthetic ingredients in consumer products.[6]

---

[4] Julianna M. Butler & Christian A. Vossler, *What is an Unregulated and Potentially Misleading Label Worth? The case of "Natural"-Labelled Groceries*, Environmental & Resource Economics, Springer; European Association of Environmental and Resource Economists, vol. 70(2), pages 545-564 (2017).

[5] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ*, FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6 ; *see also* Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www. investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp  (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025).

[6] Butler and Vossler, *supra* note 4.

GOOD GUSTAFSON AUMAIS LLP

32.     Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

33.     As a result, "natural" products are worth more than products that contain artificial ingredients, and consumers pay a premium for products labeled "natural" over products that contain synthetic ingredients.

B.  **Plaintiff and Other Reasonable Consumers Understand Natural to Mean that a Product Lacks Artificial Ingredients**

34.     Plaintiff and Class Members understand "natural" representations to mean that a product lacks synthetic ingredients.

35.     This interpretation is consistent with the understanding of a reasonable consumer.

36.     The test to determine if a company's "natural" representation is deceptive is judged by whether it would deceive or mislead a reasonable person. To assist in ascertaining what a reasonable consumer believes the term "natural" means, one can look to regulatory agency guidance.

37.     Federal agencies have warned companies that they must ensure that they can substantiate "natural" claims.

38.     In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural). In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed

into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter.[7]

39.     The FTC has warned companies that the use of the term "natural" may be deceptive:[8]

> Marketers that are using terms such as natural must ensure that they can substantiate whatever claims they are conveying to reasonable consumers. If reasonable consumers could interpret a natural claim as representing that a product contains no artificial ingredients, then the marketer must be able to substantiate that fact.

40.     Likewise, the Food and Drug Administration ("FDA") warns that any "natural" labeling on products must be "truthful and not misleading."[9]

41.     In April 2016, the FTC settled with four manufacturers and filed a complaint against a fifth company for representing that its products were "natural" when they contained Phenoxyethanol and other synthetic ingredients. The manufacturers agreed to cease marketing the products in question as being "natural."[10]

---

[7] U.S. Department of Agriculture, Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic, March 26, 2013, *available at* https://web.archive.org/web/20140818174458/http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5103308.

[8] 75 Fed. Reg. 63552, 63586 (Oct. 15, 2010).

[9] U.S. Food and Drug Administration, Small Business & Homemade Cosmetics: Fact Sheet, *available at* http://www.fda.gov/Cosmetics/ResourcesForYou/Industry/ucm388736.htm#7.

[10] *Four Companies Agree to Stop Falsely Promoting Their Personal-Care Products as "All Natural" or "100% Natural"; Fifth is Charged in Commission Complaint*, (April 2016), https://www.ftc.gov/news-events/press-releases/2016/04/four-companies-agree-stop-falsely-promoting-their-personal-care (last visited Mar. 17, 2021).

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

42.     Surveys and other market research, including expert testimony Plaintiff intends to introduce, will demonstrate that the term "natural" is misleading to a reasonable consumer because the reasonable consumer believes that the term "natural," when used to describe goods such as the Products, means that the goods are free of synthetic ingredients. For example, according to a consumer survey, "[e]ighty-six percent of consumers expect a 'natural' label to mean processed foods do not contain any artificial ingredients."[11]

43.     A reasonable consumer's understanding of the term "natural" comports with that of federal regulators and common meaning. That is, the reasonable consumer understands the representation that a product is "natural" to mean that it does not contain any synthetic ingredients.[12]

C. **Defendant Represents that the Products are Natural**

44.     Defendant capitalizes on consumers' preferences for natural products by making representations to consumers on its Products that they are natural.

45.     The front label of every Product states that the Product is "Natural."

46.     The following image is an example of that representation being prominently made on one of the Products:

---

[11] Urvashi Rangan, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 C.F.R. Part 260, Notice of the Federal Trade Commission (2010), *available at* https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00289%C2%A0/00289-57072.pdf (also accessible as Comment 58 at http://www.ftc.gov/policy/publiccomments/initiative-353).

[12] Butler and Vossler, *supra* note 4. "The vast majority of respondents stated a belief that 'natural' signals no artificial flavors, colors and/or preservatives." *Id.*

GOOD GUSTAFSON AUMAIS LLP



47.     In the above example, "Natural" is accompanied by Defendant's logo which resembles a plant.

48.     The Product also includes "natural" references on the side of the packaging where it emphasizes "Nature Meets Nurture."



49.     Based on the language that appears on the front and side of each product, Plaintiff reasonably believed that Products contained only natural ingredients.

50.    "Natural" is a representation to a reasonable consumer that the Products contain only natural ingredients.

51.    Throughout its marketing efforts, Defendant reinforces that the Products are "natural."

52.    For example, Defendant's official website makes numerous references to the Products' "Natural" composition:

a.

HOLISTIC CARE FOR WOMEN

Designed for women by women, our self-care solutions are made with natural, effective ingredients to keep you looking and feeling your best all cycle long.

b.

OUR MISSION

Improving women's lives through holistic feminine care – innovative, natural, and effective solutions for all aspects of her cycle and life.

GET TO KNOW US

c.

Organic, comfortable, and incredibly effective feminine care

Made with potent, naturally-derived ingredients and without the use of toxic or irritating chemicals. Period.

GOOD GUSTAFSON AUMAIS LLP

53.     Additionally, marketing efforts reinforce the "natural" representations on the Products' labels.



a.

54.     Defendant represents on its Products' labels and through coordinated marketing efforts that the Products are "natural."

D. **Defendant's Representations Are False, Misleading, and Deceptive**

55.     Despite representing that the Products are "natural," the Products contain multiple synthetic ingredients.

56.     Thus, Defendant's representations that the Products are "natural" is false, misleading, and deceptive because the Products contain ingredients that are, as set forth and described below, synthetic.[13]

a. **Phenoxyethanol** is a synthetic substance associated with depressing the central nervous system, vomiting, and diarrhea.[14] This synthetic chemical concerned the FDA, and the agency warned consumers against using on nursing infants because it "can depress the central nervous system" and "may cause vomiting and diarrhea, which can lead to

---

[13] Other ingredients in the Products may also be artificial as well. Plaintiff's investigation is ongoing, and as discovery commences, she will seek to amend the Complaint to specify other artificial ingredients in the future.

[14] 21 C.F.R. §172.515 *and FDA Consumer Update: Contaminated Nipple Cream*, (May 2008), https://web.archive.org/web/20140712202507/https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049301.htm (last visited Mar. 17, 2021).

GOOD GUSTAFSON AUMAIS LLP

dehydration in infants."[15] Concern for the use of this synthetic ingredient is not restricted to the United States, and after concerns were raised by the European Commission's Scientific Committee on Consumer Safety, France prohibited the labeling and marketing of products containing Phenoxyethanol for use on children that are three years old and younger.[16]

b. **Caprylyl Glycol** is a synthetic skin conditioning agent and preservative.[17]

c. **Polysorbate-20** is a synthetic emulsifier and/or surface-active agent.[18]

d. **Sodium Benzoate** is a synthetic preservative.[19] Sodium Benzoate is produced by the neutralization of benzoic acid with sodium hydroxide, or by adding benzoic acid to a hot concentrated solution of sodium carbonate until effervescence ceases. The solution is then evaporated, cooled and allowed to crystalize or evaporate to dryness, and then granulated. It does not occur naturally.[20] Sodium Benzoate has been shown to cause DNA damage and chromosomal aberrations.[21] When

---

[15] U.S. Food and Drug Administration, For Consumers, *Contaminated Nipple Cream*, https://web.archive.org/web/20140712202507/https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049301.htm (last visited Mar. 17, 2021).

[16] Agence Nationale de Sécurité du Médicament et des Produits de Santé, Decision of 13 Mars 2019, *available at* https://www.ansm.sante.fr/content/download/158253/2075101/version/1/file/DPS_Phenoxyethanol-200319.pdf.

[17] ¶ 17,483 ABS CONSUMER PRODUCTS, LLC—COMPLAINT AND CONSENT ORDER, FTC DKT. C-4584, FILE NO. 152 3269, ANNOUNCED APRIL 12, 2016; ISSUED JULY 6, 2016., Trade Reg. Rep. P 17483.

[18] *See* 21 C.F.R. § 172.515 and 21 C.F.R. § 178.3400.

[19] 21 C.F.R. § 582.3733.

[20] 21 C.F.R. § 184.1733.

[21] N. Zengin et al., The Evaluation of the Genotoxicity of Two Food Preservatives: Sodium Benzoate and Potassium Benzoate, FOOD AND CHEMICAL TOXICOLOGY

– 14 –

GOOD GUSTAFSON AUMAIS LLP

Sodium Benzoate combines with Citric Acid (a combination of ingredients present in the Product), the two substances can react to produce benzene, which is a highly toxic carcinogen that causes leukemia.[22]

e. **Ethylhexylglycerin** is a synthetic derived form of vegetable glycerin.

f. **Citric Acid** is recognized by the FDA and other federal agencies as an artificial substance.[23] Citric acid is added as a synthetic preservative, flavorant, and acidity regulator. It is commonly manufactured through solvent extraction or mycological fermentation of bacteria.[24] While the chemical's name has the word "citric" in it, citric acid is not extracted from fruit. Rather, it is industrially manufactured by fermenting genetically modified strains of the black mold fungus *Aspergillus niger*.[25]

---

763, 764-68 (2011).

[22] U.S. Food and Drug Administration, *Questions and Answers on the Occurrence of Benzene in Soft Drinks and Other Beverages*, (2018), https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q4 (last visited Nov. 16, 2020); *See Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1238 (D. Kan. 2007): "[P]roducts from defendants which contained sodium benzoate and ascorbic acid, citric acid or erythoribic acid. The Food and Drug Administration ("FDA") has reported that these ingredients may interact to form benzene, a hazardous substance which the Environmental Protection Agency ("EPA") knows to potentially cause anemia, nervous systems disorders and immunosuppression in persons who are exposed..." *and* Robert Snyder, *Leukemia and Benzene*, International Journal of Environmental Research and Public Health vol. 9,8 (2012): 2875-93 *and* Lakshmi Narayanan Venu & Anoop Austin, *Study and Quantification of Preservative (E211) In Carbonated Soft Drink Samples*, International Organization of Scientific Research Journal of Applied Chemistry vol. 12,4 (2019): 17-23 ("Sodium benzoate reacts with citric acid or ascorbic acid to form benzene").

[23] *See* FDA Informal Warning Letter to the Hirzel Canning Company (August 29, 2001) ("the addition of calcium chloride and citric acid to these products preclude use of the term 'natural' to describe this product."); U.S. International Trade Commission, Synthetic Organic Chemical Index, USCTIC Pub. 2933, at 3-105 (Nov. 1995).

[24] 21 C.F.R. § 184.1033(a).

[25] *See*, *e.g.*, Belen Max, et al. *Biotechnological Production of Citric Acid*, BRAZILIAN

– 15 –

g. **1,2-Hexanediol** is a synthetic substance that is formed by combining many chemicals such as diosgenin, chrysin, and alpha-lipoic acid.[26]

h. **Butylene Glycol** is a synthetic substance that has been shown to have negative effects on pregnant rats and their offspring.[27]

57.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know that the Products contain unnatural, synthetic ingredients, by reading the ingredients label.

58.     Discovering that the ingredients are not natural and are actually synthetic requires an investigation beyond that of the skills of the average consumer. That is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand – that these ingredients are synthetic.

59.     Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent front-of-the-product claims, representations, and warranties that the Products are "natural."

JOURNAL OF MICROBIOLOGY, 41.4 Sao Paolo (Oct./Dec. 2010) and Sweis, Iliana E, and Bryan C Cressey. *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, TOXICOLOGY REPORTS, 5.808 ( Aug. 9 2018).

[26] Kim, Yi-Ok & Jung, Kyung-Hwan. (2016). *Enzymatic Synthesis of 1, 2-Hexanediol Galactoside by Whole Cells of ?-Galactosidase-containing Recombinant Escherichia coli*. JOURNAL OF LIFE SCIENCE. 26. 608-613. 10.5352/JLS.2016.26.5.608.

[27] *Final Report on the Safety Assessment of Butylene Glycol, Hexylene Glycol, Ethoxydiglycol, and Dipropylene Glycol*, JOURNAL OF THE AMERICAN COLLEGE OF TOXICOLOGY, 4 (1985): 223 – 248.

60.     Defendant did not disclose that the above listed ingredients are synthetic ingredients anywhere on the Product. A reasonable consumer understands Defendant's "natural" claims to mean that the Products are "natural" and do not contain synthetic ingredients.

61.     Consumers rely on label representations and information in making purchasing decisions.

62.     The marketing of the Products as "natural" in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that "natural" claims are material to consumers.

63.     Additionally, Defendant is aware that products containing synthetic ingredients have lower demand and exploit reasonable consumers by projecting that the Products are "natural" and free of synthetic, bad ingredients.

64.     Defendant's deceptive representations are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

65.     Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

66.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers, as they have already deceived and misled the Plaintiff and the Class Members.

E.   **Defendant's Deceptive Conduct Caused Plaintiff's and Class Members' Injuries**

67.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay

a premium for Products labeled "natural" over comparable products not so labeled and marketed.

68.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations, Defendant injured the Plaintiff and the Class Members in that they:

    a.  Paid a sum of money for Products that were not what Defendant represented;

    b.  Paid a premium price for Products that were not what Defendant represented;

    c.  Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

    d.  Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

69.     Plaintiff and the Class Members paid for Products that were "natural" but received Products that were not "natural." The products Plaintiff and the Class Members received were worth less than the products for which they paid.

70.     Based on Defendant's misleading and deceptive representations, Defendant were able to, and did, charge a premium price for the Products over the cost of competitive products not bearing the misrepresentations.

71.     Plaintiff and the Class Members paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently,

GOOD GUSTAFSON AUMAIS LLP

Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

72.     Defendant knew that consumers will pay more for a product marketed as "natural," and intended to deceive Plaintiff and putative Class Members by labeling and marketing the Products as purportedly natural products.

73.     Plaintiff and Class Members paid for the Products over and above comparable products that did not purport to be "natural." Given that Plaintiff and Class Members paid for the Products based on Defendant's misrepresentations that they are "natural," Plaintiff and Class Members suffered an injury in the amount paid.

74.     Additionally, Plaintiff and Class Members paid a premium for the Products over and above comparable products that did not purport to be "natural." Given that Plaintiff and Class Members paid a premium for the Products based on Defendant's misrepresentations that they are "natural," Plaintiff and Class Members suffered an injury in the amount of the premium paid.

## CLASS DEFINITIONS AND ALLEGATIONS

75.     Plaintiff, pursuant to Federal Rule of Civil Procedure 23, brings this action on behalf of the following classes (collectively, the "Class," "Classes," and "Class Members"):

a.  California Class: All persons who purchased Defendant's Products within the State of California and within the applicable statute of limitations period; and

b. Nationwide Class: All persons who purchased Defendant's Products within the United States and within the applicable statute of limitations period.

76. Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

77. The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, millions of units of the Products to Class Members.

78. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

a. whether Defendant misrepresented material facts concerning the Products on the label of every product;

b. whether Defendant's conduct was unfair and/or deceptive;

c. whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon them by Plaintiff and the Classes;

d. whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

e.  whether Defendant breached express and implied warranties to Plaintiff and the Classes;

f.  whether Plaintiff and the classes have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

79.  Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the Classes, purchased Defendant's Products bearing the natural representations and Plaintiff sustained damages from Defendant's wrongful conduct.

80.  Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the classes.

81.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

82. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

83. The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

**COUNT I**
**Violation of California's Unfair Competition Law ("UCL"),**
**CAL. BUS. & PROF. CODE §§ 17200, et seq.**

84. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85. Plaintiff brings this Count individually and on behalf of the members of the Classes.

86. Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

87. Defendant violated the "unlawful" prong of the UCL by violating California's Consumer Legal Remedies Acts ("CLRA")  and False Advertising Law ("FAL"), as alleged herein.

GOOD GUSTAFSON AUMAIS LLP

88.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

89.     Defendant violated the "fraudulent" prong of the UCL by misrepresenting that the Products are "natural" when, in fact, they are made with synthetic ingredients.

90.     Plaintiff and the Class Members lost money or property as a result of Defendant's UCL violations because: because: (a) they would not have purchased the Products on the same terms if they knew that the Products were made with synthetic ingredients (b) they paid a substantial price premium compared to other cosmetic products due to Defendant's misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

91.     In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

92.     Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

93.     Because Plaintiff and the Class Members' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of Defendant's challenged behavior.

**COUNT II**
**Violation of The False Advertising Law ("FAL"),**
**CAL. BUS. & PROF. CODE §§ 17500, et seq.**

94.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.     Plaintiff brings this Count individually and on behalf of the members of the Classes.

96.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

97.     Defendant committed acts of false advertising, as defined by §§17500, *et seq.*, by misrepresenting that the Products are "natural" when they are not.

98.     Defendant knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that its representations about the Products were untrue and misleading.

99.     Defendant's actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

100.    Plaintiff and the Class Members lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were made with synthetic ingredients; (b) they paid a substantial price premium compared to other cosmetic

products due to Defendant's misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

101.    Defendant profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

102.    As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

103.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

104.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA, and restitution is not limited to returning to Plaintiff and Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

**COUNT III**
**Violation of The Consumer Legal Remedies Act ("CLRA"),**
**CAL. CIV. CODE §§ 1750, et seq.**

105.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

GOOD GUSTAFSON AUMAIS LLP

106.    Plaintiff brings this Count individually and on behalf of the members of the California Class.

107.    This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 (the "CLRA").

108.    Plaintiff and the other members of the Classes are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the Products for personal, family, or household purposes.

109.    Plaintiff, the other members of the Classes, and Defendant has engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

110.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

111.    As alleged more fully above, Defendant has violated the CLRA by falsely representing to Plaintiff and the other members of the Classes that the Products are "natural" when in fact they are made with synthetic ingredients.

112.    As a result of engaging in such conduct, Defendant has violated California Civil Code § 1770(a)(5), (a)(7) and (a)(9).

113.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided notice to Defendant of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on December 6, 2022. As of the date of filing this complaint, Defendant has not responded. Accordingly, if after 30 days no satisfactory response to resolve this litigation on a

GOOD GUSTAFSON AUMAIS LLP

class-wide basis has been received, Plaintiff will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

114.    Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

115.    In accordance with Cal. Civ. Code § 1780(d), Plaintiff is filing a declaration of venue, attached hereto as Exhibit A to this complaint.

### COUNT IV
### Unjust Enrichment

116.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

117.    Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

118.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Classes.

119.    Plaintiff and members of the Classes conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff and members of the Classes, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and members of the Classes were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

GOOD GUSTAFSON AUMAIS LLP

120.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

121.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Classes for its unjust enrichment, as ordered by the Court.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

b.   For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c.   For an order awarding, as appropriate, compensatory and monetary damages, statutory damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

d.   For an order requiring Defendant to immediately cease and desist from selling its misbranded Products in violation of law; enjoining Defendant

GOOD GUSTAFSON AUMAIS LLP

1  from continuing to label, market, advertise, distribute, and sell the

2  Products in the unlawful manner described herein; and ordering

3  Defendant to engage in corrective action;

4  e.  For prejudgment and postjudgment interest on all amounts awarded;

5  f.  For an order awarding punitive damages; and

6

7  g.  For an order awarding attorneys' fees and expenses and costs of suit.

8  ## JURY TRIAL DEMAND

9  Plaintiff demands a jury trial on all causes of action so triable.

10

11  Dated: April 10, 2023

12

13  **THE KEETON FIRM LLC**
/s/ Steffan T. Keeton

14  Steffan T. Keeton, Esq.*
100 S Commons, Ste 102

15  Pittsburgh PA 15212
Tel: (888) 412-5291

16  stkeeton@keetonfirm.com
*Pro hac vice

17

18  **Good Gustafson Aumais LLP**
J. Ryan Gustafson (Cal. Bar No. 220802)

19  2330 Westwood Blvd., No. 103
Los Angeles, CA 90064

20  Tel: (310) 274-4663

21  jrg@ggallp.com

22  **SHENAQ PC**
Amir Shenaq, Esq.**

23  3500 Lenox Road, Ste 1500

24  Atlanta, GA 30326
Tel: (888) 909-9993

25  amir@shenaqpc.com

26  **Pro hac vice forthcoming

27  *Counsel for Plaintiff and the Proposed Class*

28

GOOD GUSTAFSON AUMAIS LLP